May it please the Court? My name is Paula Barnes. This month's counsel's table is Billy Ouellette. We're from the Office of the Federal Public Defender from the District of Arizona. We represent the petitioner in this action, Mr. Milo Stanley. Mr. Stanley's Fifth Amendment rights were violated when his concessions were admitted at the guilt phase of his trial, and also when statements made in that concession were used to abrogate the death sentence. Could you help me on something on that? I'm trying to decide when it became custodial, and it's hard for me to see how it becomes custodial until they take away his hunting knife. Was that a sheath knife, a hunting knife on his belt? The record just describes it as a hunting knife, Your Honor. Ordinarily, we say hunting knife when we mean a sheath knife on the belt, and we say pen knife or pocket knife for trying to hold up something in your pocket. Correct. All we know is that this is a hunting knife in the record. The police actually admitted at the hearing that once he admitted to the shooting, he wasn't free to leave, but they allowed the knife to remain on him for 20 minutes after that. I thought they said that he was able to get up and go to the bathroom. They told him he was not under arrest, and they let him keep his knife until after he admitted to the shooting. If you also look, he asked permission to get a drink of water, so that indicates he didn't feel like he was free to just roam around at will. He asked permission to do things like move around the room. Did they tell him he was not under arrest at that point? Early on, before they talked to him, they did tell him he was not under arrest. However, after he invoked his right to a lawyer and requested to remain silent, they did not tell him he was free to leave. He had been transported there to the station by the police in their car. They did not offer him a ride back. I think it's clear that the situation changed when Officer Serrato communicated to Stanley that under his view of the evidence, no one else could have committed this crime but Mr. Stanley. Stan Ferry says that if the belief in your guilt is communicated to you, that affects how a reasonable person would have felt free to leave or not. Tell me if I remember it in this time sequence. I thought police kept telling him how difficult it was to buy the story that somebody else had abducted her and then returned the car. And then after a while, he said, I said, I guess it was me. I think I need a lawyer. And then he started crying. And after a while of his crying, the policeman said, are you okay? And then after a while more, the policeman made some other remark along the same lines. And then they arrested him. Have I got the sequence right? Well, I think you omit a crucial fact, which is that he invoked his right to remain silent and right to counsel. Right after, he hypothetically admitted to the murder. Serrato says, I think you committed this murder. It can't be no one else but you. Stanley agrees. He says, yes. At that point, he realized that he is in trouble. He needs help in talking to the police. He requests a lawyer. But these requests are ignored because... But specifically, how were the requests couched? I think you said, I think I'd better talk to a lawyer. The exact invocation, Your Honor, is did something happen with you and your wife? I think I'd better talk to a lawyer. I don't want to stay anymore. And then the officer clarified, you don't want to talk to me any further? No. Okay, we will conclude this interview at 756. And I think it's very telling that the officer himself recognized that this had turned into custodial interrogation because he knew once he requested his right to a lawyer, he turned off that tape recorder. He stopped the interrogation. Counsel, what do we make of the possibility that the police thought they were under an obligation to see if they could find out where the victims were because they might possibly still be alive? You're referring to the public safety exception. New York State Courts discusses that. And public safety exception cases are limited to situations where there's a general imminent danger of harm to the public at large. This case started with Stanley reporting a missing person. So, at first, they certainly were looking for the victims. And they're trying to find out from him whether they might still be alive. Isn't that appropriate? That may have been the case at the very beginning of the interrogation. But as things progressed, Sarajevo, I'm sorry, states that he believes the victims have been shot and killed because hypotheticals assume that they are dead. By the time he interviewed Stanley, he had seen bloody clothing and bloody spots on Stanley's car in the garage. And then he finds out about the bloody seat cover and the trash can. This information was conveyed to Stanley. And that is the crucial fact that the Arizona Supreme Court ignored. And also, they're finding that all interrogations ceased when Stanley stated he wished to speak to a lawyer. A bare reading of the record shows that that's simply not true. He was asked not one but four impermissible questions after he invoked his right to remain silent and write to a lawyer. He was asked, have you hurt yourself or anybody hurt themselves at the shot? It appears now very strongly that your wife has met some foul play. Understand? Yes, sir. There's nothing more you would like to do to locate your wife and child. There are bloody seat covers and other things. Long pause while Stanley is crying. What do you think, Milo? This pause, Stanley crying, unintelligible words. So, Saravo at the voluntary miscarriage actually admitted that these were questions. Initially, he tried to portray them as merely attempts to convey information. But on cross-examination, he had to relent that these were actually direct questions to Stanley. The Arizona Supreme Court ignored that the questioning continued. They stated that Saravo's attempt to help Stanley intelligently exercise his judgment and that the information conveyed was merely intended to arrest and custody. This is under their voluntariness analysis. Well, that conflicts directly with their custody analysis. Either he was in custody or he wasn't. They cannot have it both ways. There's no intelligent exercise exception to Miranda and Edwards. If you request a lawyer, all questioning must cease. But doesn't that request have to be pretty definitive? Not, I think I need a lawyer, but is that enough? Well, the Arizona Supreme Court and the state have never argued that his request was unequivocal. And in fact, Saravo clarified, you don't want to talk to me any further. He says, no. So, it became crystal clear at that point that there was never any question. He says, no. If we assume that the session became custodial at that point, had he already confessed? He had hypothetically admitted that under Saravo's view of the evidence, he looked guilty. I can read you the exact hypothetical he'd like. So, if that in fact happened, if the gun was taken and your wife and child, your girl were put in that car and they, for some reason, were shot, okay, and there's blood on the inside of that car and outside of that car, then who would that person have to have been? Me. And that's when he invokes his right to a lawyer. It sounds like the confession comes at the moment before. Well, the crucial evidence that they used against him on premeditation and to aggravate the death sentence came after the request for a lawyer and the request for silence were ignored. So, this was only a hypothetical admission of guilt. Again, he was hypothetical. That's under my view. He's agreeing that under Saravo's view of the evidence, he looked guilty. We don't get to approach it de novo. We have to give a DPA deference to Arizona. Well, I think under Taylor v. Maddox, the analysis is that the state supreme court ignored material probative facts which support the petitioner's position. The result is unreasonable and the review is then de novo. And I think it's unreasonable because as the district court acknowledged, Arizona supreme court fully failed to take into consideration that the nature of this interview changed. And they failed to take into consideration that his request for a lawyer and request to remain silent were clearly ignored. Miranda and Edwards represent very simple, bright lines, common sense rules. And I think it's very telling. When you say clearly ignored, when a guy is crying and a policeman says, are you okay, that's not an interrogation, or is it? To me, the impermissible questions were the questions immediately following his invocation. Not immediately following, but soon after his invocation of the right to remain silent and right to remain counsel. The coercive tactics that are similar to the Christian burial speech in Burr v. Williams. Isn't there anything more you would like to do with your wife and child? Those are the questions that start Stanley sobbing, to visibly shaking, as Officer Starr has said. But counsel, don't we have to look at the entire circumstance instead of parsing out each discrete circumstance? Don't we have to look at the totality? Yes, and I think the problem, though, with the Arizona supreme court decision is that all the factors they take into account occurred before Stanley was confronted with this evidence of guilt and directly accused of murder. And to understand, Barry, we know that would affect how a reasonable person would feel free to leave. And given that this was a murder case, and you've just been accused of murder, no reasonable person would feel free to leave at that point, after just hypothetically admitting your guilt. And you request counsel to remain silent, I think that's another factor that the Arizona supreme court ignored. But these coercive tactics amounted to overreaching. Beyond the, I guess it was me, did he make statements amounting to a confession before or after they took his hunting knife away and told him he was under arrest? He continued to confess. That's what, I'm sorry, I'm trying to find it here. Yes, the police admitted at the hearing that once he admitted to the shooting, he wasn't free to leave, but they allowed the knife to remain on him for 20 minutes after that. So the knife really didn't bear on their determination of whether or not he was free to leave. It was how much he was confessing. Counsel, how do you distinguish the supreme court case of Oregon versus Mathiasson, which held that a suspect was not in custody despite being informed that he was a suspect and confronted with fabricated evidence linking him to the crime? How do you distinguish that case? If I, if my memory is correct, I believe there was a break in custody in Mathiasson. But the holding of that case says that he wasn't in custody despite being told that he was informed that he was a suspect. So you were pointing out the fact that Mr. Stanley was accused of having committed the crime and confronted with evidence, but in light of Oregon versus Mathiasson, how does that help your case? I believe also in Mathiasson, he wasn't arrested after that. And I think that is what, that also factors into the analysis, is given the severity of the charge here, murder, it wasn't like he was being accused of some other crime where a district attorney might have to make the decision before they arrest him whether or not he's really in custody. He was directly accused of murder. He was not allowed to leave after that. He was arrested. And the cases talk about how that plays into the custody analysis. Counsel, you'd probably better move on to your other issues. Okay. I'll move on to the ineffective assistance. Could you help me on something that bothers me on the ineffective assistance? Sure. If I understand it right, you're not saying it was ineffective assistance because the lawyer did not argue to the jury that because he's drunk and high it should just be manslaughter or second degree, it shouldn't be first degree. What you're saying, it was ineffective assistance not to waive the privilege for Dr. Hammett so that the psychiatrist who did testify could have used her report as a basis. Is that correct? Correct. And I want to make sure I distinguish here, though, between the guilt and the sentencing phase. Because if you look at trial counsel's motion. I thought it was both. It's basically the same argument for both. The argument is for both, but I think it's a much stronger argument for the sentencing phase. And here's why. Because... Go ahead. Okay, but that is the argument. It's all about waiving Hammett. Right. But I think it's important to point out that it's not clear that this entire interview would have had to have come in. If you looked at Dr. Garcia-Bunel's affidavit, he said all he needed to do was confer with Dr. Hammett. The only thing from that interview that was important to the experts for their diagnosis was his description after the crime that exactly matched the associate's reaction. Let me ask you now about Dr. Hammett. Okay. I read the interview with her, and to me it looks deadly. To me it looks like he just hurts and doesn't help. And the critical part, it looks to me like, is on 794 of the excerpts where she says, I found no indicators of psychotic thought processes. And she goes on to say his emotional response was appropriate. Nothing to make her think there was a psychotic thought process. And then when she goes on a few pages later to discuss the dissociative reaction, he said it was like he was watching and like he wasn't even there. And she was asked, what do you attribute that to? You don't attribute that to being psychotic? And she says, no. I thought it probably had something to do with whatever state of intoxication he was involved in at the time, as well as the fact that most people don't ever believe that they themselves are going to be in a situation like he found himself in when he sobered up. I couldn't see where it did him any good. So it seemed like just a reasonable strategic decision by his lawyer to keep it out. The only thing we know about his strategy, if you look at his motion, was that he was trying to keep it out because it contained a concession. At the same time, he was trying to keep out the concession to the officers. This strategy changes when you're looking at the sentencing phase. And also, you have the court experts changing his opinion based upon this statement from one of not insane at the time of the crime to insane at the time of the crime. That is a great benefit. It wouldn't have been helped much by studying what Dr. Hammett said, where she says, I examined him right after the crime, and in my opinion, he was not insane. She says he's no indication of a psychotic thought process, but that's not at the time of the crime. This is when she sees him a day and a half later. She was the first one after the crime. Right, and that's why her statement, Stanley's statement to her about what happened at the time of the crime, that is the key piece of evidence that they wanted to look at. All these other opinions, she didn't actually write a psychological report. This was merely a defense interview. She wasn't even interviewed by trial counsel. She was interviewed by the investigator. So it's not clear that all this other stuff about the no psychotic thought process, all of her other opinions would have had to have come in anyway. A lot of this negative evidence the state points to, all that came in through Dr. Gerstenberger's testimony anyway. Gee, is there a number under the rule, what do we call it, the rule of completion, when a lawyer got part of something in, the other lawyer gets the rest of it in? Well, it's unclear whether the state would have called her to the stand or what would have occurred, and that is why we need a hearing. What's the good part? Just show me the page where the good part is for the defense. It's the statement where she says, where he relates to her exactly what he said happened at the time of the crime. The part where he said he felt like he was watching like he wasn't even there. And this is important because it's the classic statement of a dissociative reaction. And the problem was that the experts weren't able to see him at the time of the crime. Trial counsel should have been tipped off from the testimony of the guilty that the Hammond information was vital. That statement was right where I read to you from, at 800, and where she follows it by rejecting the notion that it implied psychosis. What her report was useful for was for her observation evidence. They could have just talked to her to get that. But how could that have helped him at the guilt phase? Because there's no diminished capacity defense in Arizona. So how could that have helped him at the guilt phase? You're still allowed to put on a defense based on observation evidence about your ability to premeditate at the time of the crime. And Clarke v. Arizona clarified that. Counsel, do you think at the guilt phase his statement to her that he said he flew off the wall and shot them, could that have come in? Yes, I believe it could have come in. The experts would have reviewed that and they would have taken that into consideration in their diagnosis. Several experts at the guilt phase when they were testifying or attempting to testify about dyslexia, the reaction mentioned Stanley's body memory. And it was difficult to know what his state of mind at the time of the crime was because of the lack of contemporaneous information. This should have tipped trial counsel off at sentencing. I should have given that information to the experts. But counsel, wouldn't you agree that there was far more damaging evidence in this report than there was helpful information? I would not agree. I think the fact that the court's experts switched from a finding of not insane to insane is a huge benefit. And the fact is the state's experts already testified to all this damaging evidence and more. And in fact, she says quite a lot about, despite her statements taken out of context, that nothing he said indicated to me any degree of remorse, per se. He was certainly grieving for them being gone. She said he was quite emotionally distraught, freely sobbing. She had to give him medication. She gave him a high level of Thorazine, a nusk that's usually reserved to treat psychotic people. So that goes against her own statement that he wasn't psychotic. She was giving him a level of Thorazine. When I saw the Thorazine, I thought schizophrenia because that's what it's usually used for. But then she testified about it, and she said, no, he wasn't psychotic. I gave it to him so he could sleep and deal with the horror of what he'd done. One of the other experts testified, though, that normally they're not given over the amount that she gave him unless you're psychotic. There's evidence that he claimed that he heard voices would certainly tie into schizophrenia, I would think. Yes, and that's another key point I want to make is that the mental health evidence of dissociative reaction and schizoaffective disorder were never talked about or even argued at sentencing. Counsel did nothing on that at all. He presented 28 pages of transcripts. It amounted to basically that Stanley was a good guy and that the crime was out of character. He did nothing to try to offer the kind of explanatory mitigation, as this court has often said, could lead to a reasonable probability of a life sentence. What's the best psychiatric evidence that did come in and that could have come in at the sentencing? I think the diagnosis of schizoaffective disorder and the dissociative reaction. Another thing which wasn't addressed was the major documented depression that Stanley suffered over the death of his wife and child. Even the state's experts, even Dr. Hammond, had to recognize that. The history of blackouts, head injuries, and another clear place in which... He was an alcoholic, right? More than alcoholic, Your Honor. I mean, they blacked out and hit their heads all the time. Dr. Gerstenberger and Dr. Stewart, who are both the state's experts, I think this is where the clear error comes in on the failure to have experts to explain the import of long-term chronic alcohol and drug abuse and intoxication at the time of the crime because the sentencing judge specifically found that the amount of drugs and alcohol that Stanley ingested was not enough to make him intoxicated at the time of the crime. Well, Judge Meeker's dissent on a direct appeal explains that that is simply wrong. There was no expert testimony to support that. Now, at the guilt stage, because of the state of Arizona law on voluntary intoxication, Dr. Gerstenberger and Dr. Stewart were allowed that he didn't suffer from any mental disease or defect. Well, that was technically true because Arizona law does not recognize them as mental disorders. On Arizona law, what a lot of lawyers would have done in this case, and I understand this is not on appeal as ineffective assistance because of Arizona law. I want to make sure I understand it. A lot of lawyers would have presented as an argument to the jury that he was so drunk that he was incapable of premeditating and deliberating. He was incapable of a deliberate intention to kill. It was the alcohol talking, and so you ought to convict him only of manslaughter and hope for maybe a second degree, but I gather that just doesn't work in Arizona. Is that right? Arizona is one of the most restrictive states when it comes to diminished capacity evidence in voluntary intoxication, but those restrictions go out the window at sentencing, and the trial judges made an erroneous finding because the reports of the state's own experts said that he did, in fact, suffer from a recognized disorder of substance abuse. I thought what the trial judge said was that because he shot him both in the top of the head with the muzzle in contact with the head, and he said he shot his daughter so that she wouldn't talk, that that overwhelmed the other considerations, outweighed the other considerations, so I don't understand how it ties in. Because he found that he wasn't intoxicated, so that those actions take on a lot more causability than if he was intoxicated and suffering from mental disease at the time he did that, and the state's own experts had to recognize that there was some level of impairment due to intoxication at the time of the crime, and that was simply never argued by trial counsel. I would like to reserve the remainder of my time for a moment. Why don't we just take an extra five or ten minutes now? This is a troubling case for all of us. You look like you have some more things you want to say. Then I think we'll give Republican time also. We will. Take an extra five minutes now. We'll still have another five for rebuttal. So I think one clear area is that if you look at Dr. Gerstenberger and Dr. Stewart's report, and these were the state's experts, they say that Stanley suffers from major depression, alcohol dependence, cocaine dependence, hallucinogen abuse, cannabis abuse. Dr. Gerstenberger stated that his major problem was substance abuse rather than a sociopathic personality. And there was Stanley is not intoxicated. There is no potential for violence or dangerous behavior. That's very mitigating evidence coming out of the mouth of the state's expert. But at the guilt phase, he wasn't allowed to testify to that. He said he didn't have a mental disease defect. Dr. Stewart, also the state's expert, diagnosed with mixed substance abuse including cocaine and cannabis, alcohol dependence, and major depression. He noted that the substance abuse and alcoholism was of such severity that it would warrant enrollment in a treatment facility. More importantly, he stated that Stanley was suffering from a substance abuse disorder at the time of the crime. And that this disorder could have greatly impaired his ability to reason and controlled his behavior at the time of the crime. That conflicts directly with what the trial judge found because he was not presented with this testimony to explain. In addition to the evidence of acute intoxication, there is also evidence of long-term chronic drug and alcohol abuse. Another mitigating fact about this is that it began when Stanley was only 14 years old. Dr. Bindouklaas could have explained that this could have been an attempt to self-medicate the early onsite signs of schizoaffective disorder. And that is important because it changes this drug and alcohol abuse from one of free choice to one where he is attempting to medicate an unattended to mental illness. They could have talked about how the sustained drug and alcohol abuse would have affected Stanley's developing brain as a 14-year-old. He got poor to failing grades. He was a high school dropout. He had a lower than average IQ. If you contrast this with what trial counsel put on, it really is a contrast. It's actually very telling because it's this good guy, out-of-character evidence, which does nothing to explain the crime. The specific instances of deficient performance, in addition to failing to call any mental health experts at the sentencing phase, but that he didn't even properly prepare them to testify at the guilt phase. Dr. Bindouklaas said, Counsel spent virtually no time in preparing me for my testimony. He never discussed with me how the diagnosis of dissociative reaction would have affected the insanity defense. At the guilt phase, he was attached for not mentioning dissociative reaction in his report. And he stated, You'd have to ask trial counsel why we are focusing so much now on trial and dissociative reaction when my report didn't. He failed to provide Dr. Bindouklaas with raw data for testing done by Stewart and Gersonberger. He failed to give him a transcript of his own interview with the prosecutor before he went on the stand. A critical thing in the diagnosis of schizophrenia is hallucinations and delusions. It's pretty much diagnostic. And Dr. Bindouklaas testifies psychosis, schizoaffective disorder with paranoid ideation, hallucinations, depression, and psychosis, as he told us. And I do not remember paranoid ideation or hallucinations being described. Could you refresh my memory? What paranoid ideation or hallucinations did he report? I believe Dr. Bindouklaas talked about the fact that Stanley mentions when he was doing cocaine that he would have some feelings of paranoia that just coupled with his schizoaffective disorder plus the cocaine use caused paranoid feelings. So a dissociative reaction could have helped explain the crime and why Stanley may have appeared normal hours after the crime. A dissociative reaction causes a break with reality. It can begin and end abruptly. A child, Garcia-Bunel, described the likelihood of this as unlikely. However, once he had the information about Stanley's description right after the crime, he said that he did suffer from a dissociative reaction at the time and that as a result of this condition, it's highly probable that he met the criteria for McNaughton's standard for insanity. So that would be highly mitigating evidence. Not only would it meet G1, but it would meet the standard for insanity. What case said that a dissociative reaction meets the McNaughton standard in Arizona? Is there a case in Arizona that says that? Not that I know of, Your Honor. The test back then was both of the crimes of McNaughton. It was only after the time of Stanley's trial that they did away with the other crime. So we appreciate right from wrong to know the nature and quality of your actions. To dissociative action, you feel like you're watching yourself and you can't control what's happening. You're outside yourself watching. Yeah, but that says you're outside yourself, but it doesn't necessarily say you can't control it. I think whether or not you could argue about whether it met insanity, the fact is that it was something that should have been argued in mitigation. Because you don't have to meet the insanity to fit G1 significant impairment. And I think this court's precedent talks at length about that. Frierson says that at your guilt phase, you must show a very specific and very substantial level of mental impairment. But all potential mitigation is relevant in sentencing. So mental problems may help, even if they don't rise to a specific level of insanity. I'm talking about at the guilt phase. At the guilt phase, would that have been admissible in Arizona? They did. Dr. Findelblatt did testify that he suffered from a dissociative reaction. So the testimony was allowed in at the guilt phase. Okay, and so then why was there ineffective assistance if similar testimony was admitted at the guilt phase? Because he didn't provide the experts with the background information they needed to make their diagnosis. Dr. Findelblatt testified that it was highly unlikely that Stanley was suffering from a dissociative reaction. On post-conviction, affidavits were provided which stated that had he known about this perfect description right after the crime, a day and a half after the crime, it would have completely changed his opinion from one of not insane to insane at the time of the crime. Did he say why? I don't remember him saying why. And when I looked at what she said, what Dr. Hammett said, I couldn't see how. Why that it was his problem? Why that would change his opinion for the better from the defense standpoint when what she actually said was so bad from the defense standpoint. Because it wasn't so much her conclusion. She wasn't an expert who testified. It was her observation evidence and simply relaying what he said. All I could get was that what he said was he felt like it wasn't really him. He was just watching the dissociative reaction. Right. Is there more? But that is very important to the experts. That was a classic definition of dissociative reaction. Dr. Stewart gave him a lower than average IQ. And as both Dr. Vindoglas and Garcia-Bunel said, right at the time of the crime, a man of this low average intelligence giving such a perfect description of dissociative reaction would be very unlikely for him to malinger that. But does that equate to mental illness? When it's coupled with his schizoaffective disorder, dissociative reaction is in the DSM, the recognized event, dissociative disorders. But to meet the definition of insanity? Well, it was allowed in Arizona at the guilt phase. It was up to the jury to determine that. But it was allowed in as a possible diagnosis that would meet that. Thank you, counsel. Thank you. We will be given time for rebuttal even though we've gone over it. Counsel? Thank you. May it please the Court, my name is Kent Titani. I'm an assistant attorney general for the state of Arizona representing respondents in this matter. I'd like to start with the second issue. In particular, I'll focus on Dr. Garcia-Bunuel's affidavit in the post-conviction proceeding. Dr. Garcia-Bunuel suggests in that affidavit that this interview transcript of Dr. Hammett would have been significant to him. And the briefs mention a report. Both briefs, I think, inadvertently talk about a report. There is no report from Dr. Hammett. It is simply the transcript of the interview. And it's simply, as you've pointed out, these statements that it was as if I was watching myself that I flew off the wall. It's the only thing that's remotely helpful to him. But what I want to point out is... Well, there are also other things in it that were helpful. He was sobbing the whole time, and he was remorseful. Right, but in terms of going to his mental state at the time of the crime, Dr. Bindleglass had put in his report that Stanley had auditory hallucinations, was hearing voices. Dr. Garcia-Bunuel, in his report, after having interviewed Stanley four times, or three times for approximately four hours, he clarifies in his report that the auditory hallucinations did not occur until after the crime. So he's clarifying what's in Dr. Bindleglass's report. And this is after specifically questioning and examining Stanley. In contrast, Dr. Hammett's role was not to probe into the facts and circumstances of the crime. In fact, she said she specifically did not do that. That wasn't her role. But in that report, or the questioning of Hammett, it comes out that he had been hearing voices for a long time. Is that right? I don't think that comes out in... I don't recall that from Dr. Hammett's report. That's in Dr. Bindleglass's report, hearing voices. And Dr. Hammett's focus was never on... She testified that, or she didn't testify, her interview statement, she said simply, she was there to make him comfortable, basically to treat him for depression, and she never viewed herself as even having a physician-client privilege. She never asked any probing questions about the facts and circumstances of the crime. So there's no follow-up, and there's no real suggestion that she's done an in-depth analysis. And when she's asked, well, what do you make of his statement that it was as if he was watching himself, she attributes that to his consumption of alcohol or drugs. And so there's no diagnosis at that point from... And in fact, she says, I can't find any psychotic disorders. Let me ask you about what troubles me the most in this case. I don't know if it has any legal significance at all. It may not, but it troubles me. We get cases in Alaska all the time. We also have a statute that says that intoxication is no defense. We get cases all the time where somebody gets drunk, and they shoot their best friend or their husband or their wife, and they wind up with second degree or manslaughter in a very long sentence or perhaps consecutive 99-year sentences or something like that. But it typically gets taken down from first degree to second degree or manslaughter. And this case looked like that kind of case, and I didn't understand how come it didn't wind up getting taken down to second degree or manslaughter. I gather Arizona has some even more restrictive laws in Alaska. Could you explain it? The current law is very restrictive. At the time Stanley was tried, voluntary intoxication could be considered. Experts couldn't offer an opinion as to his state of mind at the time of the crime, but the statute was not changed in Arizona until 1994 that says voluntary intoxication is not a defense to any state of mind. It was actually something that could be considered at the time, and I think it was considered. But it's important to note the trial court in its special verdict notes really an absence of significant evidence of intoxication based on Stanley's conduct. In committing the crime, based on his statement to police officers that he shot his daughter because she had seen him shoot his wife, he has to drive on a five-mile mountain road. He gets rid of the body. He comes back and reports his family missing. After first going to a convenience store or a video store, asking the clerk if he's seen his wife and daughter, they're missing, and running a video, the clerk doesn't really note any evidence of alcohol on his breath. So you don't have a significant... I see. So the problem wasn't that he was far from presenting it. It's just there was a lot of evidence he wasn't that drunk and high. Right, and I think you see that the trial court imposed a life sentence for killing his wife, and I think for the reasons that you've suggested. But the court noted that it's different now with the daughter. There's more aggravating circumstances, and it's a hard contact wound to the top of the head, and he tells the officers... Hard contact, meaning the muzzle was in contact with the top of the head? Yes, and he tells the officers that he killed her because she had seen him shoot the mother. And so you have... Then you have the extra aggravating circumstances, the age of the victim and the depravity. There were three aggravating circumstances with multiple murders. So again, your sense of, if this had just been he shot his wife after an argument in Arizona, the result would have been what it was here. He was not sentenced to death for that. But when you add the aggravating circumstances of the age of the victim, his role as the parent, the depravity of going out, and then the court notes... It was clear that he understood what he had done. And that's another thing that Dr. Hammett... Why Dr. Hammett's statements were so harmful to him. She said he knew immediately what he had done. And so it's... I think there are very compelling reasons why the court in this instance imposed death, notwithstanding the evidence that he was allowed to put on relating to intoxication. It's significant that Stanley was examined by seven mental health experts. And only one came up with a diagnosis that he met the endotten standard. When we get to the post-condition stage to argue about ineffective assistance, the only claim was really that the expert should have been given this report or this transcript from the interview with Dr. Hammett. And again, that was... Dr. Garcia-Buñuel had corrected Dr. Bingleglass's reports where he had said that Stanley had auditory hallucinations. And that's presumably after having interviewed Stanley extensively. I think the sentencing strategy was not necessarily a bad strategy. Here, he was trying to put on... His argument at sentencing was Stanley was essentially a good guy who had a bad day. And given all of the... He didn't have a criminal record. This was a... Why not just throw in everything? Throw in the kitchen sink at sentencing. The strategy made sense. It made sense to me. It made sense to trial. Keep Dr. Hammett out. Because I thought her testimony was really bad for him. Her interview with the defense lawyer's own investigator was really bad for this defendant. Nevertheless, it hadn't worked. And why not just throw everything in at sentencing? He did throw everything in at sentencing. I think he did throw everything in at sentencing. It's clear the judge had... So he kept Dr. Hammett's interview out. Well, he kept that out because I think it's still more harmful than it is helpful. The only statement that you have is as if I was seeing myself. And the rest of her report is not helpful. And he already had that type of evidence in through Dr. Demoglass. And I think it undermines it when you have all of these other statements that he knew what he was doing. I think the heart of the case for ineffective assistance at sentencing is he should have let the other doctors read Dr. Hammett's interview because then their opinions, according to their affidavits, would have been more favorable to Stanley. And the only one that we're talking about is really Dr. Garcia-Buñuel. There's two affidavits. One of them is Demoglass who had already said he's McNaughton insane and Hammett's interview simply confirms that. Garcia-Buñuel's change of this says, yeah, I would have found that he's insane. But that really wasn't very credible at all given the fact that he corrected Dr. Demoglass in saying that he had auditory hallucinations before or during the crime. But the difficulty is that, I mean, sentencing things that may not be persuasive in the guilt phase may just turn the tide in terms of life versus death. So, I mean, can you say that there's no reasonable probability that this would not have made a difference in the sentence? Well, I think you can say that in terms of Dr. Hammett's interview transcript. The only marginally helpful portions are those statements. I flew off the wall. This is if I was seeing myself. And then you add all this other stuff that, yeah, he knew exactly what he was doing. No psychotic disorder whatsoever. So, and when we're saying what more could you have done at sentencing, again, the judge had heard all of this. And under Bell versus Cohen, I think the analysis is that it's not ineffective if all this information was in front of the judge. But not in the same way because of the limitations of the use of the evidence because you throw in all the drug abuse. You throw in, you know, the low IQ. All of that comes in where it doesn't necessarily come in at the guilt phase. Right, but here he came out. I think the testimony is that he's of average intelligence. He doesn't have a criminal background. And there's really no, there's no diagnosis of a mental health problem other than this one incident where they're saying this was a dissociative episode. So, you don't have a mental health history. And this is after having been examined by seven mental health experts. And all those reports are in. The judge has all of those reports. But you know, counsel, there's nothing to substitute for live testimony. That's another aspect of this. He didn't call any of these people. He didn't make that the highlight of his presentation to the judge. They were called at trial, though. I'm talking about sentencing. Right, but I would suggest that these issues were, in fact, developed at the guilt phase. Because there isn't this focus on any other type of mental health disorder, notwithstanding these exhaustive mental health examinations. All they've come up with is a dissociative reaction at the time of the incident. There's really no other diagnosis of significant mental health difficulties. And so, I think that was the problem that counsel faced. And you do have... And how long was it between trial and sentencing? The guilt verdict was on July 10th. And the sentence was imposed September 26th. That's quite a while. It's a couple of months. But he has all of the reports. He submitted a sentencing memorandum. And I think you see that he did decide to only impose life for the murder of the wife. I think based on the same sense that you have of why this would be problematic or that it was somehow related to alcohol. And I think he factored that in. But there's nothing like live testimony. You know, we judges, and I'm sure this judge, we sit and we read and we read and we get a little distracted by this emphasis that doesn't have the exchange between the court and the individual. That to me is something that's very interesting in this case that he didn't think he needed to call these people. I would agree. There is some significance to live testimony. You also have the problem for the defense counsel that you subject these experts to more rigorous cross-examination. And when they haven't really diagnosed him with any other mental health difficulty, that all comes out as well. You have the benefit of these reports and their testimony at trial. And I guess under Bell v. Cohn, I don't think that's necessarily, well, I certainly understand that that could be a strategic decision that an attorney could make. I think it's reasonable under Bell v. Cohn to take a different approach. But counsel, when we're exacting the ultimate penalty, don't you think that we should make every effort to make sure that the defendant has the benefit of the very best representation possible to him? I would agree with that. But if we go back, what we're looking at is an ineffective assistance of counsel claim. And the focus is entirely on Dr. Garcia-Buñuel's affidavit where he said it would have made a difference to me if I had heard this, if I had known about this interview previously. There really isn't a suggestion that the judge didn't understand everything else. He was well aware. The judge wasn't able to hear that opinion because the attorney didn't flesh that out sufficiently, didn't provide the Hammond interview to the doctor so the doctor could have complete information to form his opinion. That just troubles me a little bit when we're exacting the death penalty that we don't gloss over the shortcomings of counsel who are representing the individuals who are going to have to pay with their lives. I understand that. I mean, I would agree that certainly we want to have a complete record and get as much information as possible. But when the information that we're talking about isn't all that helpful, it's from someone who did not probe into the facts and circumstances of the offense in any way when, in fact, all the other doctors did. It's hard to fault a defense attorney whose client's been examined by seven mental health experts and who hasn't come up with, none of whom other than Dr. Bindelglass has come up with a significant diagnosis. But at least one judge in Arizona thought it would have made a difference. Judge Minker? Right. And certainly different people can have different reactions to the evidence that's presented. But in terms of our review under the AEDPA, I don't think the fact that one judge may have a different point of view provides a basis for relief for relief on federal collateral review. I'm just thinking Judge Minker made some excellent points about, you know, he's an Arizona judge and so arguably more familiar with the confines of Arizona law just, you know, made the point that this perhaps would have made a difference in terms of sentencing. That's the thing that troubles me. I guess what I would point out is Judge Minker's statements are on direct appeal which come prior to the post-conviction proceeding. Right. So this is developed, Judge Minker, there's no dissenting opinion from the denial of post-conviction relief or from the Arizona Supreme Court, obviously that is just the trial court at the post-conviction initially, the proceeding, and then there's also a petition for review to the Arizona Supreme Court. So when we're talking about was he ineffective, there's no dissenting opinion on that. But I was just talking about in terms of the evidence. So the probative nature of the evidence that was not presented. Right. But I don't think Minker would have been commenting on that as part of the direct appeal since that wasn't the focus of the direct appeal. Well, but the direct appeal was focused on whether or not that the evidence of mental health was important at sentencing. That's correct. But in terms of the mental health evidence that was not presented, that didn't come up until the post-conviction proceeding. Are you saying, I want to make sure I understand right, that what Justice Minker dissented on was whether the death penalty was appropriate, not whether there was ineffective assistance in the death penalty phase of the trial for not putting on live testimony? That's correct. The ineffective assistance claim doesn't come up. On that ineffective assistance claim, I think the Arizona Supreme Court summarily denied discretionary review. Is that right? That's correct. Do we have a reasoned opinion by the Arizona Court on whether it was ineffective assistance not to put on the psychiatrist live at sentencing rather than putting on affidavits to supplement the live testimony they had given at trial? I don't recall that having been the focus. The post-conviction ruling is in the excerpt of record 76. That's what I was looking at. I didn't see it. Tell me what I should look at there for what we should do. I think because the evidence was in front of us, I think we are bound by Bell v. Coleman because this came in at sentencing during the guilt phase. It's not necessarily ineffective not to repeat the same type of evidence. Are we revealing DeNovo at that point? If the state court did not address that specific issue, are we under deference or are we revealing this DeNovo? We are clearly under deference. The claim presented to the Arizona Supreme Court was this failure to present the interview transcript from Dr. Hammond to the expert. That's what ultimately went up in the Arizona Supreme Court. That's the issue. In Bell v. Coleman, the Supreme Court specifically said that the ineffective assistance claim for not recalling the medical experts during sentencing to testify live, that that ineffective assistance claim failed because counsel recently could have concluded that the substance of their testimony was still fresh to the jury. Do you happen to recall what the time interval was? That's jury, not judge. I don't recall. What happens in Arizona now that we've moved to  sentencing, there isn't the gap between trial and sentencing. There is a difference we have gone from July to September. Judges also typically take more notes than juries. The judge also had the benefit of the pre-trial trial. He notes in his special verdict he considered the pre-trial proceedings something the jury would not have had. When you go through the special verdict, he makes clear he considered this extensive evidence presented is not compelling evidence of a mental health problem other than alcohol and drug abuse. That, at the end of the day, isn't as compelling as some sort of mental health disorder that's been diagnosed by a mental health professional. Is it unreasonable for him to have given really kind of dismissed the alcohol and the drug uses really not significant and don't amount to any kind of mitigation? Well, I don't think it's unreasonable to do that, again, given the facts and circumstances of the crime, where he'd have to drive on a mountain road five miles. The clerk who sees him within two or three hours after doesn't notice alcohol in his breath. He's whippet enough to figure out he needs to go to the convenience store. I don't think it's unreasonable. Certainly alcohol could have played a role, and I think all of the experts and the trial court would recognize that, but it's not nearly as significant as Stanley's counsel was pitching. Was there evidence he could have gotten drunk later after he had done this? He just other than he had time after the offense, I don't know that there's any, the evidence would be the clerk didn't notice alcohol in his breath, and no one ever suggests that he's drunk. What I'm asking about is the clerk didn't notice alcohol in his breath. The police did. I can't remember how much time there was in between, and I can't remember where he was physically or whether he had access to alcohol in between. My recollection is that the police met him at his apartment. When he got there? No. He got home and called them and they came out on a missing end. He didn't have a beer in the fridge. I don't recall. All I remember is the movie. There's plenty of testimony that he had those four wine coolers on that day and also used cocaine. There is testimony to that effect. But, again, given the thought process that he had, I'm going to shoot my daughter because she saw me kill my wife. I'm going to be able to navigate this road. I'm going to be able to go and rent a video. He says this has been a problem since he was 14 years of age. He doesn't have a history of committing these types of crimes. There's really nothing that suggests that he was just in an alcoholic stupor or a drug induced stupor. That's inconsistent with being able to get rid of the body. Wouldn't it have been helpful for experts to hash this out for the judge whether or not the drug use impaired his ability to comprehend what he had done. At the sentencing phase, usually there's a lot more focus on childhood, upbringing. There was none of that. What his circumstances of life were from the time he was born to the time he committed this crime. Normally that's what we see. We did have testimony from his father. He was an only child raised by parents. His reports to the doctors were that he had a good childhood. He worked with his father. That certainly was investigated and his father testified at the sentencing hearing. The testimony of the few people who did testify just indicated that they really hadn't been properly prepared to bring out adequately any of the positive points. I read that transcript and I realized reading isn't like seeing it live, but it was just dead and ineffective. I think the problem when you're an attorney, when you have someone who doesn't have a significant mental health disorder, when you have it examined by seven different experts. I'm talking about what took place at the sentencing hearing. The preparation of the minister was minuscule and the testimony really unhelpful. That's because I think the minister didn't know him at all before. You didn't have a lot of good evidence. That's the purpose of the post conviction proceeding. That's your chance to bring in what would this evidence have been. We didn't have that. There wasn't any offer of that. This was someone who came from a good family, didn't have a criminal background. The focus for the defense attorney was to look at the other cases where the defendants are much worse than Stanley. I don't know if that's unreasonable. When you say he's so damaged it makes it difficult to make that case when he doesn't have a criminal background and no one has diagnosed him with a criminal background. I think he's correctly focused on the factors that we believe are significant in terms of whether this was a custodial interview. He did wear a hunting mask all the way through on his belt. The brief says he was never told he was under arrest. It's much stronger than that. He was told at least three times that you are not under arrest. What about the point when he said he didn't want to talk anymore? How does that affect the analysis of whether or not he was in custody or would have felt free to leave? I don't think it changes the analysis. Let's say the questioning is occurring at his home. It wasn't at his home at this point. It was at a government office. How would that affect his ability or his perception that he was free to leave? If he said he thought he should talk to a lawyer and he didn't want to talk anymore and the questioning continued at that point, how does that affect the analysis? I think it's a factor you can take into account. Is that a factor weighing towards custodial interrogation? What counter balances that factor in your view? What counter balances it is that he specifically told on several occasions you're not under arrest. After he said I think I need to talk to a lawyer and I don't want to talk to him anymore, what counter balances the custodial nature of that? He's still wearing his uniform. He  think I          don't want to talk to him anymore. I don't want to talk to him anymore. I don't want to talk to him anymore. He was packing his tape recorder and instead of going he sat and cried. The policeman said something to the effector. Are you okay? Initially the interview stopped and he went outside and talked to officers at the garage. He comes back in and tells them they found some bloody items. Is there anything else you want to tell us about? That's where the public safety exception policy comes in. I think so. This is within 24 hours. The sequence is he says I think I need a lawyer. The police outside the room say they found a bloody blanket and then he comes back in and basically asks can you tell us how to find the blanket. He doesn't say anything at that point. Then he's packing up and leaving and then Stanley remains there and is crying and then he comes in and what's wrong. I agree with the assessment of that but that was not the functional equivalent of interrogation. The question is what's wrong. Is there something I can do to help you. Just shoot me. Why would I want to shoot you because I shot them. At that point I would agree he's clearly under arrest. Prior to that the hypotheticals they probably would have arrested him but they didn't. He's gone with them voluntarily. This is initiated by family. I don't think there's anything untoward about what took place. I think the officers did more than what was required by reading his Miranda rights. The fact that they read his rights I don't think turns it into a custodial interrogation. They did something they didn't have to do and they were trying to be cautious. This is when they did a consent search but they also went and got a judge to issue a warrant to do a search. I think this was careful police work. They're trying to find people missing for less than 24 hours. I don't think based on under the analysis that's set forth in Yarbrough versus Alvarado, if fair minded jurists could disagree whether the defendant was in custody the state court decision should be upheld. I think that's what best we have here. Fair minded jurists may be able to do that. Under the circumstances I don't think there was anything and certainly this wasn't a line of questioning that they were overbearing or denying family food or water and this wasn't a very lengthy interview. This all took place in less than an hour. Under the circumstances trying to find two missing people, I think this was good police work and I don't think you established a basis for reversing that ruling particularly under the deferential standard under the ADTA. Thank you counsel. This was not a strong death penalty case. As Judge Vinker described the facts surrounding    that it's unlikely that Stanley formed the intent to kill at the time his wife died. He said it's unlikely that Stanley formed the intent to  the time his wife died. It's more likely the defendant who had an ongoing argument with his wife formed the intent to kill suddenly. Given this factual background the influence of alcohol and cocaine use prior to the shooting is not an undeniable fact. It's not recorded in the tape recorded confession. It's not recorded in Sarabo's notes of what happened at the confession. In fact, he tells Stanley I don't know why. It's suspicious. A lot of us who did criminal defense went by kind of a rule of thumb that if it wasn't in the police report then the policeman testified to it the policeman was lying. I don't know if prosecutors feel that way but we defense lawyers did. Nevertheless, that Dr. Hammond basically would have corroborated it. Well, the ineffective assistance of sentencing counsel claims did not just involve Dr. Hammond. It involved intoxication at the time of the crime, the chronic and long-term substance abuse and how that could affect Stanley. The dissociative reaction, the effect of disorder, all this information could have been explained and the significance of it brought to the court  Dr. Hammond was to have been. The lawyer in this case obviously didn't want his clients to lose and get sentenced to death. He obviously was acting on the basis of what he thought was a good strategy. His subsequent motions showed that he had never forgotten about Dr. Hammond's testimony. We can all think of things he could have done differently, but I'm not clear on exactly what the lawyer could have done differently that beyond just being a speculative possibility of a miracle could have swayed this trial judge. The trial judge thought he wasn't all that important. I don't think it was obvious that he employed good strategy. I think there was a lot of speculation about whether or not there was strategy. Half the lawyers are in the bottom half in terms of quality, half are in the top half, and even in the top half people make strategic calls that are mistakes. Well, I think there's no excuse for presenting no evidence of your client's intoxication at the time of the crime, long-term drug and alcohol abuse, mental disorders. There's simply no excuse for not presenting that at all. The judge didn't know that? I thought there was a lot of focus on that. But he made a mistake actually in the amount of alcohol that Stanley ingested in his order. He found that that amount of cocaine was not enough to cause impairment. That's directly in conflict with all four expert reports including the state's experts. So how count those failures to present anything, to explain the scientific import of this evidence directly led to the trial judge's mistake? There was some explanation. There was his behavior afterwards, the driving, the hiding, the bodies, the convenience store, the false report to the police, all that stuff. The doctor didn't just have the experts. He also had the other facts. I mean, the judge didn't just have the experts. He had all the other facts. If you or I get codeine after we get a tooth pulled or get some kind of narcotic drug after we get a wisdom tooth pulled, we're likely to just doze the rest of the day. But a dope addict probably won't affect him at all because his tolerance is built up. I can see where experts would testify, oh, that much cocaine, that would really affect him a lot. And then the judge could look at the facts and say, oh, maybe it would affect you or me a lot, most people a lot, but not this guy, not based on what he did. Well, the fact is we don't know what the trial judge would have found had he been presented in a compelling manner with live testimony. Trial counsel simply did nothing and all we are asking for here is a hearing to determine what he did. When you say did nothing, I assume you're using that in a rhetorical sense. In terms of not calling any witnesses to try to explain the mental health evidence, the intoxication. And what did he do with sentencing? He presented 28 pages of testimony. He put on six different witnesses who basically said, I know Mr. Stanley, he's a good guy, he's climbed out of character and he did a couple of witnesses testify that he did not have a problem with drugs and alcohol. But if you just have lay testimony without expert testimony to explain exactly what that can do to a person who's been using since the age of 14, by the time he committed this crime, he'd been using drugs and alcohol on almost a daily basis for half of his life. And we're not talking about insignificant evidence.   evidence that has a significant reason not to attempt, not to try to explain the significance of this evidence. And Bell v. Cohn is distinguishable. The judge already knew it from trial, didn't he? The problem is that it was a different fact finder at guilt in his case. He was a different judge at sentencing than there was at the guilt phase in this case. No, it   but the jury was a fact finder at the guilt high sentencing phase. The jury was a fact finder at the guilt high sentencing phase. And also to distinguish Bell v. Cohn, Tennessee law allowed testimony regarding intoxication as evidence of insanity. The experts were able to testify there that the drug use affected his ability to obey the law. I would point the court towards ER 461, 462, which is the jury instruction that the jury was given on the limitations of intoxication evidence at the time of the crime. So it's important to remember that this ineffective assistance of counsel claim doesn't just include Dr. Cohn's testimony.   includes Dr. Bell's testimony that he had an opportunity to explain how this crime happened. All I did was say it was out of character. But the mental health testimony could have explained that his mind had been warped by years and years of drug abuse and mental illness and that he was normally a non-violent man and he had a dissociative reaction and the heat of an argument with his wife, this unfortunate crime happened. If there's no more questions, please. Thank you, counsel. Family   requested to    hearing is    the floor. Dr.   Dr. Bell's testimony that he had an opportunity to explain how this crime happened. All I did was say it was out of character. But the mental           group of people who had no choice but to sit down and speak. They all have an opportunity to speak. And they
judges: Fletcher, Kleinfeld, Rawlinson